IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Eartha M. Pearce, )<br>　　　　　　　　Plaintiff, )<br>　　vs. )<br>Jo Anne B. Barnhart,<br>Commissioner of Social Security, )<br>　　　　　　　　Defendant. ) | Civil Action No. 8:04-23337-RBH-BHH<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

On February 17, 1999, the plaintiff filed an application for DIB alleging disability beginning July 10, 1998. The application was denied initially and on reconsideration. On October 15, 1999, the plaintiff requested a hearing, which was held on May 19, 2000. Following the hearing, at which the plaintiff, her attorney and a vocational expert appeared, the administrative law judge ("ALJ") considered the case *de novo*, and on

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

July 19, 2000, determined that the plaintiff was not entitled to benefits.  On February 8,

2002, the Appeals Council remanded the case to the ALJ for further consideration.

In the meantime, the plaintiff filed a second application for DIB on June 20,

2001.  That application was denied initially and on reconsideration, and the plaintiff filed a

timely request for a hearing on March 11, 2002.  A supplemental hearing was held on both

applications on January 6, 2003, at which the plaintiff, her attorney and a vocational expert

appeared.  On February 21, 2003, the ALJ determined that the plaintiff was not under a

disability.  This determination became the final decision of the Commissioner when it was

adopted by the Appeals Council on October 25, 2004.

In making the determination that the plaintiff was not entitled to benefits, the

ALJ made the following findings:

> (1)    The claimant meets the nondisability requirements for a
> period of disability and Disability Insurance Benefits set forth in
> Section 216(i) of the Social Security Act and is insured for
> benefits through the date of this decision.
>
> (2)    The claimant has not engaged in substantial gainful
> activity since the alleged onset of disability.
>
> (3)    The claimant has an impairment or a combination of
> impairments considered "severe" based on the requirements in
> the Regulations 20 CFR § 404.1520(b).
>
> (4)    These medically determinable impairments do not meet
> or medically equal one of the listed impairments in Appendix 1,
> Subpart P, Regulation No. 4.
>
> (5)    The undersigned finds the claimant's allegations
> regarding her limitations are not totally credible for the reasons
> set forth in the body of the decision.
>
> (6)    The undersigned has carefully considered all of the
> medical opinions in the record regarding the severity of the
> claimant's impairments (20 CFR § 404.1527).
>
> (7)    The claimant has the residual functional capacity to
> perform a range of light work, restricted to preclude work that
> would not allow performance while standing or seated.

2

(8)    The claimant's current impairments do not prevent her from performing her past relevant work as a file clerk, as she performed that job (20 CFR § 404.1565).

(9)    The claimant is a "younger individual" (20 CFR § 404.1563).

(10)    The claimant has a "high school education" (20 CFR § 404.1564).

(11)    The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568).

(12)    Even if she could not perform her past relevant work, the claimant has the residual functional capacity to perform at least a significant range of sedentary work (20 CFR § 404.1567).

(13)    Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work. using Medical-Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as an assembler (1,600 jobs in South Carolina and 106,000 in the United States); quality control inspector (500 jobs in the state and 14,000 in the nation): and hand packer (100 jobs in the state and 6,500 in the national economy).

(14)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## EVIDENCE PRESENTED

The plaintiff was 38 years old on the date she claims she became disabled due to lower back pain, and 42 years old on the date of the Commissioner's final decision. (Tr. 193.)  She has a high school education and has worked as an assembly-line worker and file clerk.  (Tr. 156, 210.)

On December 3, 1996, the plaintiff was evaluated by Dr. Steven C. Poletti of the Carolina Spine Institute.  The plaintiff complained of pain in the low back, right hip, and

3

lateral aspect of the right leg after being struck by a lawn mower part on a conveyor belt. Dr. Poletti's examination revealed normal strength, normal reflexes, normal sensation, and mild right-sided muscle spasm.  He restricted the plaintiff from work for three weeks, recommended an epidural steroid injection, and rendered a diagnosis of disc disruption with probable annular tear at L5-S1.  (Tr. 301.)

The plaintiff underwent an epidural steroid injection on December 9, 1996. (Tr. 300.)  On January 7, 1997, Dr. Poletti noted the injection had helped but had not "cured" the plaintiff. (Tr. 299.)

On March 4, 1997, Dr. Poletti noted that the plaintiff's back and leg were "worsening subjectively" and that her objective findings included positive straight leg raising (SLR)[2] and decreased ankle jerk reflex.  (Tr. 298.)

On March 7, 1997, the plaintiff underwent an MRI study of the lumbar spine which showed a shallow "essentially contained" central herniation at L5-S1 with no clear evidence of nerve root displacement.  (Tr. 291-92.)  On March 14, 1997, Dr. Poletti reviewed the results of the plaintiff's MRI study and found there was "not much nerve root displacement." He also noted that the plaintiff was on light-duty restrictions at work and that she described her pain as "unbearable in that beyond her work restrictions she is able to do very little else at home."  (Tr. 297.)

On March 28, 1997, the plaintiff underwent a lumbar discography which showed disc disruption at L5-S1.  (Tr. 289-90.)  On April 23, 1997, the plaintiff told Dr. Poletti that she was unable to live with her pain.  Dr. Poletti cautioned her against surgical

---

[2] The straight leg-raising test (SLR) is designed to detect nerve root pressure, tension, or irritation of the sciatic nerve. With the knee fully extended, the physician raises the involved leg from the examining table. A positive SLR, which requires reproduction of pain at an elevation of less than 60 degrees, is the single most important sign of nerve root pressure produced by disc herniation.  Andersson and McNeill, *Lumbar Spine Syndromes* 37 (Springer-Verlag Wein, 1989).

treatment based on the results of her discography and concluded she could not return to "heavy-duty work with or without surgery."  (Tr. 296.)

On May 20, 1997, Dr. Poletti noted that the plaintiff was still working on "modified duty status without anything much more than desk work" and that her neurological examination was unchanged.  He advised the plaintiff that surgical treatment offered a reasonable chance of improvement but the plaintiff expressed reservations about surgery. Dr. Poletti concluded the plaintiff had reached maximum medical improvement and had a ten percent permanent partial impairment rating of the whole person.  (Tr. 295.)

On July 13, 1998, Dr. Henry J. Marion, a family practitioner, examined the plaintiff.   The plaintiff told Dr. Marion that she had experienced only "[s]ome mild discomfort" while doing light duty work and that after she resumed full duty work her symptoms worsened.  Dr. Marion's examination revealed negative SLRs, normal reflexes, tenderness in the lumbosacral and mid-spinous areas, and tenderness in the gluteal area and sciatic notch.  Dr. Marion rendered an assessment of "[c]hronic back pain – disk herniation" and prescribed Ultram and Flexeril.  (Tr. 314.)

On July 27, 1998, and August 20, 1998, the plaintiff reported partial relief of her symptoms to Dr. Marion, who continued her prescriptions.  On the latter date, Dr. Marion noted: "Light duty was tried previously and was helpful. However, there is no light duty work activity at this time."  (Tr. 313.)

On October 1, 1998, the plaintiff complained to Dr. Marion of gastrointestinal discomfort and dizziness when taking Ultram.  With the exception of tenderness, Dr. Marion found no abnormalities upon examination.  He prescribed Naprosyn in place of Ultram and released the plaintiff to work as of November 8, 1998, stating as follows:

> Maximum medical benefit has been obtained to this point and patient is advised to return to full work responsibilities 11/8/98. Limited work activity to 25 pounds lifting no extended standing, sitting, or moving is advised.

5

(Tr. 312.)

In a letter to the plaintiff's attorney dated December 15, 1998, Dr. Howard L. Brilliant of Parkwood Orthopedic Clinic stated that his examination of the plaintiff revealed normal gait; intact upper extremities; negative SLR; good range of motion of the hips, knees, and ankles; intact neurological function in the lower extremities; diffuse tenderness in the back; and limited flexion and extension of the spine without muscle spasm. Dr. Brilliant concluded the plaintiff had reached maximum medical improvement and had a 30-to-40 percent impairment of the spine "secondary to her persistent pain, difficulty doing things, and proven L5-S1 disc rupture." (Tr. 302-03.)

On January 26, 1999, the plaintiff complained to Dr. Marion of persistent lower back discomfort. The plaintiff reported that Flexeril produced sedation and that Naprosyn was minimally effective. Examination revealed tenderness in the lumbosacral area, decreased lateral motion, and decreased hip flexion. Dr. Marion prescribed Voltaren. (Tr. 312.)

In an Attending Physician's Statement form dated February 18, 1999, Dr. Brilliant indicated that the plaintiff was totally disabled for any occupation. He also indicated that he had seen the plaintiff only once, on December 15, 1998. (Tr. 306.)

In a letter to the plaintiff's attorney dated March 4, 1999, Dr. Marion stated that the plaintiff was "unable to perform work responsibilities." (Tr. 311.)

In a letter to the plaintiff's attorney dated March 5, 1999, Dr. Brilliant stated that if the plaintiff did not have surgical treatment she would have permanent limitations of no lifting, no bending, and no carrying over five pounds. (Tr. 304.)

On April 4, 1999, Dr. Charles C. Jones, a State Agency physician, assessed the plaintiff's residual functional capacity at the request of the Commissioner, based on a

review of the plaintiff's records.  Dr. Jones reported that the plaintiff could perform medium work[3] that required no climbing of scaffolds, ropes, or ladders and no more than frequent climbing of ramps and stairs.  (Tr. 316-23.)  Another State Agency physician concurred in Dr. Jones's assessment on September 20, 1999.  (Tr. 323.)

On June 25, 1999, Jean R. Hutchinson, M.Ed., prepared an Employability Evaluation of the plaintiff.  Ms. Hutchinson stated that the plaintiff had held an assembly line position for 11 years until September 1996, when she sustained a work-related injury, and that she performed light-duty work as a file clerk for approximately 1½ years after her injury. Ms. Hutchinson concluded, based on the plaintiff's "age, educational background, past work experience and transferable skills, and physical limitations and pain," that the plaintiff was unable to perform any of her past jobs and unable to meet the exertional requirements of any level of work, including sedentary work.  (Tr. 225-30.)

In an Attending Physician's Statement form dated October 28, 1999, Dr. Marion indicated that the plaintiff was totally disabled for any occupation.  "Tenderness to palpation/motion in lumbosacral paraspinal and mid-spinous areas" was the only objective finding Dr. Marion stated in support of his opinion.  (Tr. 306.)

On May 4, 2000, Dr. Marion gave a telephonic statement in response to questions posed by the plaintiff's attorney.  Dr. Marion stated that he had treated the plaintiff from July 13, 1998, through April 27, 2000, that her diagnosis was chronic back pain, and that she was totally disabled.  He stated that based on the plaintiff's description of her symptoms, she was unable to sit, stand, or perform repetitive grasping or pulling for more than two to three hours at one time.  Dr. Marion stated that he prescribed Vioxx for the plaintiff and that drowsiness or an inability to concentrate "could be a problem" with Vioxx.

---

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary or light work." 20 C.F.R. § 404.1567(c) (2005).

He stated that the plaintiff's symptoms were consistent with "an L-5, S-1 disc rupture" and with his clinical finding of discomfort with lateral motions, flexion, and extension.  He also stated that the plaintiff could not lift more than 20 pounds on a regular basis.  (Tr. 164-65, 179-88.)

On May 11, 2000, Hutchinson "reevaluated [her] file" on the plaintiff at the request of the plaintiff's attorney.  Hutchinson stated that based on statements made by Dr. Brilliant and Dr. Marion, the plaintiff was unable to perform any work.  (Tr. 249-51.)

At the hearing on May 19, 2000, the plaintiff testified that the condition of her back was about the same as it was in September 1996.  (Tr. 483.)  She testified that lower back pain and drowsiness were the problems that prevented her from working.  (Tr. 485-86.)  She testified that she performed light duty work for approximately 1½ years after her injury, but that when she was placed in the assembly line position she had held prior to her accident her pain became unbearable. (Tr. 490.)  She testified that her assembly line position involved putting wheels on tractors and overhead lifting of approximately 40 pounds. (Tr. 500-03.) She testified that her light duty job as a file clerk involved filing, using a copy machine, answering the telephone, and pulling invoices, and that she was taking Naprosyn when she performed that work. (Tr. 520-25.) She testified that she was able to manage her file clerk duties so to avoid standing for extended period. (Tr. 524.)  She testified that the job required four-to-five hours of sitting per day, permitted her to "get up and move around" when she wanted to, and involved lifting no more than five pounds.  (Tr. 524-25.)  She testified that on a typical day made a light breakfast, read or did puzzles, walked around her house, watched television, and would lie down after she took her medication, but that she did no cleaning or other cooking.  (Tr. 491-94, 515-19.)  She testified that her medication made her drowsy. (Tr. 495.)  She testified that she could stand for two hours, sit for 2½ hours, and walk one-half mile.  (Tr. 514-15.)

On April 23, 2001, the plaintiff underwent a sleep study at Orangeburg Lung

8

Associates, P.A. (Tr. 176-77.)  Dr. Francis Dayrit reported that the results of the study showed moderate obstructive sleep apnea and that the plaintiff "may benefit" from the use of a CPAP machine.  (Tr. 177.)

On May 17, 2001, Dr. Dayrit reported that the plaintiff was unable to afford a CPAP due to lack of insurance.  (Tr. 326.)

On November 21, 2001, Susan E. Heape, Ph.D., a Vocational Rehabilitation Consultant, reviewed documents related to the plaintiff's claim for DIB at the request of the plaintiff's attorney.  Dr. Heape "synthesized the diagnosis, findings, observations, and conclusions of the various sources" and concluded that the plaintiff's case was "one centered on the issue of the non-exertional limitations created by pain."  Dr. Heape stated that "it would seem advisable to revisit the vocational expert witness's testimony in this case because there are numerous and significant errors in the information that she provided to the [ALJ]."  Based on her review of the medical and other evidence, Dr. Heape concluded that the plaintiff was totally disabled "due to pain as a result of internal disc disruption." (Tr. 154-58.)

On December 4, 2001, Dr. Marion reported that the plaintiff could lift a maximum of 25 pounds and that she could not stand or sit "for extended periods greater than 2-3 [hours]."  Dr. Marion also indicated that the plaintiff could never climb, stoop, crouch, kneel, or crawl; that she could occasionally balance; that she could not perform repetitive push/pull movements; and that she should avoid moving machinery, heights, and environmental irritants.  (Tr. 345-46.)

In a letter to the plaintiff's attorney dated April 4, 2002, Dr. Brilliant stated that he examined the plaintiff on that date and found she had normal gait and balance; intact upper extremities; good range of motion of the neck, hips, knees, and ankles; negative SLR; normal neurologic function in the lower extremities; and good peripheral pulses.  He also found she had trouble walking on her heels and toes and was diffusely tender at the

9

lumbosacral junction. Dr. Brilliant stated that the plaintiff's diagnosis was "[c]hronic lumbosacral strain possible disc injury;" that she had reached maximum medical improvement; and that "[b]ased on the persistent pain symptomatology and inability to work she had a 25% impairment of the lumbosacral spine." (Tr. 456-57.)

In a letter to the plaintiff's attorney dated August 8, 2002, Dr. Dayrit stated that the plaintiff had not obtained a CPAP machine and that her moderate sleep apnea "most likely" contributed to her drowsiness. (Tr. 342.)

On August 9, 2002, Dr. Marion prescribed medication for the plaintiff for essential hypertension and Vioxx for "some recurrent lower back discomfort." (Tr. 344.)

In a letter to the plaintiff's attorney dated August 29, 2002, Dr. Brilliant stated that the plaintiff remained "persistently symptomatic" and was unable to lift or carry more than five pounds. (Tr. 455.)

At the hearing on January 6, 2003, the plaintiff testified that she had not attempted to work since July 10, 1998 (Tr. 71). She testified that she was no longer being treated by an orthopedic specialist and that Dr. Marion was her only treating physician (Tr. 72-73). She testified that she took Vioxx for relief of pain, Effexor for depression, and medication for high blood pressure. (Tr. 88-91.) She testified that she started taking Effexor sometime after May 2000. (Tr. 89.) She testified that she used a CPAP machine at night for sleep apnea. (Tr. 85-86.) She testified that her medications made her feel drowsy and that she took a nap between 12:00 p.m. and 1:00 p.m. every day. (Tr. 92-94.)

J. Adger Brown, M.A., a vocational expert, testified that the plaintiff's past jobs of assembly line worker and file clerk were unskilled light jobs that provided no transferable skills. (Tr. 99-100.) He testified that her file clerk job was classified as light work "because of the standing and walking versus the lifting." (Tr. 100.) The ALJ asked Mr. Brown to assume that the plaintiff had the residual functional capacity to perform sedentary work that involved lifting no more than 3-5 pounds frequently and no more than 10 pounds

10

occasionally, and that required no kneeling or squatting. (Tr. 100.) Mr. Brown testified that with those limitations the plaintiff could work as an assembler, quality control inspector, and hand packer. (Tr. 100-01.) He testified that an individual who had to change position once an hour could perform those jobs. (Tr. 102.) Mr. Brown also testified that a person who had to take a one-hour nap during the workday and was unable to maintain minimal concentration during the remainder of the workday could not perform those or any other jobs. (Tr. 104-05.)

In a letter to the plaintiff's attorney dated February 10, 2004, Ms. Hutchinson stated that based on the plaintiff's age, education, work experience, "physical limitations, unrelenting pain, and drowsiness," she believed the plaintiff was "unemployable." (Tr. 348-51.)

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past

relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  *See* 20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *See* 20 C.F.R. §404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  Social Security Ruling ("SSR") 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion.  It consists of more than a mere

12

> scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

The plaintiff contends the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in (1) assessing her credibility; (2) harboring judicial bias against her; (3) giving weight to the opinion of State agency consultants; and (4) questioning the vocational expert and not properly discounting that expert's testimony based on cross examination. The Court will address each alleged error in turn.

### I.    THE CLAIMANT'S CREDIBILITY

The plaintiff argues further that the ALJ erred by not finding her subjective complaints of pain credible. Federal regulations, 20 C.F.R. §§ 416.929(a) and 404.1529(a), provide the authoritative standard for the evaluation of pain in disability determinations. *See Craig v. Chater*, 76 F.3d 585, 593 (4th Cir. 1996). Under these regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, "there must be objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 591 (quotation and emphasis omitted). This threshold test "does not . . . entail a determination of the 'intensity, persistence, or functionally limiting effect' of the claimant's asserted pain." *Id.* at 594. Second, and only after the threshold inquiry has been satisfied, "the intensity and persistence of the claimant's pain, and the extent to which it

13

affects her ability to work, must be evaluated." *Id*. at 595.  When the ALJ fails to "expressly consider the threshold question" and instead proceeds "directly to considering the credibility of [the] subjective allegations of pain," remand is warranted.  *Id*. at 596.

Here, the ALJ made precisely this analysis and in its proper order. (*See* Tr. 23.)  The plaintiff, however, accuses the ALJ of failing to properly credit or consider the various opinions of Drs. Marion, Brilliant, Dayrit, and Murali.  The plaintiff's contention is simply not true.  The ALJ considered all of the medical evidence in her evaluation of the plaintiff's credibility (Tr. 23-24) and gave reasons for the weight given to each opinion, either expressly or implicitly.  (Tr. at 21 (Dayrit), 22 (Murali), 23 (Dayrit) 24-25 (Brillaint and Marion).  The plaintiff simply disagrees with the ALJ as to the effect of that evidence.  It is the Commissioner's duty to resolve conflicts in the evidence, however, and it is immaterial that the evidence could support a conclusion that is inconsistent with that of the Commissioner. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996); *Shively v. Heckler*, 739 F.2d 16 987, 990 (4th Cir. 1984).  Some but not all of the substantial evidence relied upon by the ALJ is as follows.

Dr. Marion, Plaintiff's family physician, stated her limitations as no lifting over 25 pounds and no extended standing, sitting, or moving (Tr. 312). In October 2001, Dr. Marion stated that Plaintiff could lift a maximum of 25 pounds, could not stand or sit for extended periods, could not perform repetitive pushing and pulling, and had postural and environmental restrictions (Tr. 345-47). The fact that Dr. Marion elsewhere indicated Plaintiff was totally disabled without finding any change in her condition did not require the ALJ to disregard these more specific assessments of her limitations.

In December 1998, Dr. Brilliant found Plaintiff had a normal gait, intact upper extremities, a negative SLR, good range of motion of the hips, knees, and ankles, and intact neurological function in the lower extremities (Tr. 302). In October 1999, "tenderness" was the only clinical finding which Dr. Marion reported in support of his opinion that

14

Plaintiff was disabled (Tr. 306).

The ALJ gave detailed reasons for discounting the various physician opinions (Tr. 23-24) and appropriately compared the plaintiff's subjective complaints of pain to the extent of her daily activites and capabilities (Tr. 23). If the ALJ had relied exclusively on the determinations of Dr. Poletti, which occurred largely prior to the alleged onset date, there would be cause for concern; but such is not the case. The ALJ gave reasoned consideration to the medical evidence. While reasonable minds may disagree as to the plaintiff's credibility in light of the record, it cannot be said that there was not substantial evidence to support the ALJ's credibility determination.

## II.   JUDICIAL BIAS

The plaintiff accuses the ALJ of conducting a hearing infected with judicial bias. As the Commissioner rightly responds, administrative adjudicators, such as ALJs, are presumed to be unbiased. *See Schweiker v. McClure*, 456 U.S. 188, 195-196 (1982). A plaintiff can only rebut that presumption by showing that the ALJ had a conflict of interest or by showing some other specific reason for disqualification. *See id.* The burden of overcoming that presumption rests with the plaintiff. *See id.* The plaintiff must show the ALJ engaged in conduct that was so extreme it deprived the hearing of fundamental fairness mandated by due process. *See Liteky v. United States*, 510 U.S. 540, 555-556 (1994). Plaintiff has made no such showing in this case and her allegations are not even remotely supported by the record. Although the Court cannot consider connotation, tone, or inflection from a paper transcript, the portions cited by the plaintiff are simply not indicative of bias. (*See* Tr. 92-94, 109.)

## III.   STATE AGENCY MEDICAL CONSULTANTS

The plaintiff contends that the ALJ improperly gave weight to the opinion of the State agency medical consultants. The plaintiff's argument as to this point is baseless. In a 12 page decision, the ALJ summarily remarked that her conclusion of not disabled was also

15

"further supported by the opinions of the State agency medical consultants." (Tr. 27.) She accorded those opinions no controlling weight. *See id*. It is not inappropriate, however, if the ALJ gives such opinions some weight. *See* 20 C.F.R. § 404.1527(f)(2) (2005); Social Security Ruling 96-6p.

The opinions of the State agency physicians, however, were not the only evidence the ALJ relied upon in denying the plaintiff's claim. In fact, her reliance on such opinions appears gratuitous at best. The ALJ discussed all of the significant evidence of record and expressly considered the plaintiff's work activity after September 1996 (Tr. 20), Dr. Marion's opinion that plaintiff could perform light work (Tr. 20), Dr. Poletti's comments and assessments (Tr. 23-24), the plaintiff's impairment ratings, and the lack of objective findings supportive of complaints of debilitating pain (Tr. 20-26). Accordingly, her conclusion of not disabled was supported by other substantial evidence, even if the State agency opinions should have been disregarded. Therefore, the ALJ did not place improper weight on the contested opinions, if any at all.

### IV.    HYPOTHETICAL TO THE VOCATIONAL EXPERT

Finally, the plaintiff contends that the ALJ failed to include all her limitations in her hypothetical question to the vocational expert. It is true that "[i]n order for a vocational expert's opinion to be relevant or helpful . . . it must be in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989). But "while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record." *See Russell v. Barnhart*, 58 Fed. Appx. 25, 30 (4th Cir. 2003); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987). To that end, the ALJ "has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record." *Toney v. Shalala*, 1994 WL 463427, *1 (4th Cir. Aug. 29, 1994); *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir.1986); *Bradford v. Secretary of Dep't of*

16

*Health and Human Services*, 803 F.2d 871, 874 (6th Cir.1986); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir.1983).

The ALJ, therefore, was not required to accept Plaintiff's subjective complaints and/or opinions favorable to her claim as controlling.  As discussed above, the ALJ thoroughly detailed the reasons for discounting the physician opinions that were favorable to the plaintiff.  (*See* Tr. 22-25.)  Those reasons were supported by substantial evidence in the record.  *Id*.    Further, the ALJ properly considered the cross examination of the vocational expert by the plaintiff's attorney.  (Tr. 27.)

### V.    THE PLAINTIFF'S PAIN MEDICATION AND DROWSINESS

In her assignments of error one and four, the plaintiff argues that the ALJ did not properly consider the effects of the plaintiff's drowsiness, either as a result of Vioxx or sleep apnea.  The Court agrees that the ALJ could have engaged in a more express treatment of this issue.  The Court, however, disagrees that the matter warrants remand or reversal. The ALJ mentions the plaintiff's Vioxx usage, sleep apnea, and related drowsiness such that there is no question but that the ALJ considered the issues.  (*See, e.g.*, Tr. 21, 22.) And, as discussed, the ALJ had substantial evidence, otherwise, to conclude as she did. The Court, therefore, declines to remand.

### <u>CONCLUSION AND RECOMMENDATION</u>

Based upon the foregoing, this Court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed.

IT IS SO RECOMMENDED.

s/ Bruce H. Hendricks
United States Magistrate Judge

February 14, 2006
Greenville, South Carolina

17

18